1  GLENN D. POMERANTZ (State Bar No. 112503)
   Glenn.Pomerantz@mto.com
2  JONATHAN E. ALTMAN (State Bar No. 170607)
   Jonathan.Altman@mto.com
3  CAROLYN HOECKER LUEDTKE (State Bar No. 207976)
   Carolyn.Luedtke@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Thirty-Fifth Floor
   Los Angeles, CA  90071-1560
6  Telephone:  (213) 683-9100
   Facsimile:   (213) 687-3702
7

8  DEVIN A. MCRAE (State Bar No. 223239)
   dmcrae@earlysullivan.com
9  EARLY SULLIVAN WRIGHT GIZER &McRAE LLP
   6420 Wilshire Blvd., 17th Floor
10 Los Angeles, California 90048
   Telephone:  (323) 301-4660
11 Facsimile:   (323) 301-4676

12 Attorneys for Plaintiffs
   KENNY ROSEN, CORIE HENSON, AND MICHAEL
13 O'SULLIVAN

14              UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16                    WESTERN DIVISION

17                CV12·9751 GW (JCGx)

18 Kenny Rosen, Corie Henson, and        CASE NO.
   Michael O'Sullivan,
19                                        COMPLAINT FOR DECLARATORY
                Plaintiffs,               AND INJUNCTIVE RELIEF; AND
20                                        FOR DAMAGES
          vs.
21
   CBS Broadcasting Inc.,
22
                Defendant.
23

24

25      Plaintiffs Kenny Rosen, Corie Henson, and Michael O'Sullivan

26 (collectively, "Plaintiffs"), hereby bring this Complaint against CBS Broadcasting

27 Inc. ("CBS") for declaratory and injunctive relief, and for damages sustained from

28 CBS's breach of contract.  Plaintiffs allege on personal knowledge all facts known

1  to them, and on information and belief as to all other facts, as follows:

2  <center>**SUMMARY OF THE ACTION**</center>

3      1.    More than three months ago, CBS brought a lawsuit in this District

4  alleging that Mr. Rosen, Ms. Henson, and Mr. O'Sullivan—the same individuals

5  who are Plaintiffs in this action—misappropriated CBS's trade secrets, breached

6  their contracts with a CBS production company, breached their fiduciary duties,

7  infringed CBS's copyrights, engaged in unfair competition, engaged in conversion

8  of CBS property, and took part in a conspiracy with American Broadcasting

9  Companies, Inc. ("ABC") and others to perpetrate this supposed misconduct.

10      2.    CBS made these allegations as part of its campaign to prevent, or at the

11  very least, disrupt and harass, the production of a new reality show *The Glass

12  House,* which CBS regarded as competitive with its reality show *Big Brother.*

13  Plaintiffs had previously worked on *Big Brother* and then took jobs on *The Glass

14  House.* CBS intended to send a message that former CBS employees who later

15  dared to work for a competing show would be punished.

16      3.    CBS's claims relied in part on non-disclosure agreements Plaintiffs

17  had signed when they worked on *Big Brother.* Although CBS's complaint never

18  mentioned that the non-disclosure agreements contained mandatory arbitration

19  clauses, CBS knew full well that the non-disclosure agreements required arbitration

20  when it filed its federal action. CBS chose to forego arbitration in favor of the

21  federal forum.

22      4.    CBS made the most of its choice to invoke the federal court

23  jurisdiction over its claims. Promptly after filing its federal court complaint, CBS

24  filed a motion seeking an order from the District Court barring ABC from airing

25  *The Glass House.* In advance of briefing that motion, CBS filed applications with

26  the Court demanding that the Plaintiffs and ABC collect and produce a voluminous

27  number of documents while simultaneously making witnesses available for ten

28  depositions within two weeks. The District Court ultimately required Plaintiffs and

<center>- 2 -</center>

1  ABC to produce certain documents and to make Mr. Rosen available for a full day

2  deposition.  CBS then filed its lengthy *ex parte* application for an order blocking

3  *The Glass House* from airing.  The Court denied CBS's TRO application, issuing a

4  comprehensive order describing in detail why CBS was unlikely to prevail on any

5  of its claims.

6       5.    The Plaintiffs and ABC then filed a motion to dismiss.  After waiting

7  as long as possible to respond, CBS amended its complaint, dropping Plaintiffs two-

8  and-a-half months after it had baselessly sued them.  Two weeks later, with the

9  remaining corporate defendants' 12(b)(6) and anti-SLAPP motions looming, CBS

10  voluntarily dismissed its federal court action.

11       6.    But CBS was not done harassing Plaintiffs.  On the same day that CBS

12  dropped the Plaintiffs from its federal case, it belatedly attempted to invoke the

13  previously ignored arbitration provision in the non-disclosure agreements.  After

14  reading the Order from the Court that methodically disposed of every one of its

15  claims as unlikely to succeed on the merits, CBS wanted no more to do with the

16  federal judiciary.  Instead, it went forum shopping, sending arbitration demands to

17  Plaintiffs that claimed breach of the non-disclosure agreements and sought

18  *$1 million* in liquidated and punitive damages from each of the individual Plaintiffs.

19       7.    CBS's arbitration demand involves exactly the same claims and same

20  facts upon which CBS sought to build a case in federal court.  Moreover, the

21  arbitration demand refers expressly to discovery CBS obtained during the court

22  action.

23       8.    Accordingly, Plaintiffs seek a declaration from this Court—the forum

24  in which CBS initiated and vigorously pursued *these* disputes with *these*

25  individuals—that CBS has waived its right to arbitrate these disputes through its

26  conduct in the litigation before this Court.  Plaintiffs also seek a declaration that

27  CBS's breach of contract and misappropriation claims are without merit.  In

28

1  addition, Plaintiffs seek damages for CBS's breach of the provision in the non-

2  disclosure agreements requiring the parties to keep any arbitration confidential.

3  **PARTIES**

4       9.    Plaintiff Kenny Rosen is a United States citizen, and a resident of and

5  domiciled in the State of California.  He lives in Beverly Hills, California.  Mr.

6  Rosen was recently the Executive Producer of *The Glass House*, a television show

7  produced by Keep Calm and Carry On Productions ("Keep Calm") and broadcast

8  by ABC.

9       10.    Plaintiff Corie Henson is a United States citizen, and is a resident of

10  and domiciled in the State of California.  She lives in Sherman Oaks, California.

11  Ms. Henson is currently, and has been since 2008, ABC's Vice President of

12  Alternative Programming.

13       11.    Plaintiff Michael O'Sullivan is a United States citizen, and is a resident

14  of and domiciled in the State of California.  He lives in Woodland Hills, California.

15  Mr. O'Sullivan was a Co-Executive Producer for *The Glass House*.

16       12.    Plaintiffs are informed and believe, and thereon allege, that CBS is a

17  corporation organized under the laws of New York and maintains its principal place

18  of business in New York, New York.  Plaintiffs are informed and believe, and

19  thereon allege, that CBS is the exclusive U.S. licensee of the television series *Big*

20  *Brother* and broadcasts the series on the CBS Television Network.

21  **JURISDICTION AND VENUE**

22       13.    This Court has subject-matter jurisdiction over this civil action

23  pursuant to 28 U.S.C. § 1332.  There is complete diversity of citizenship in this case

24  between Plaintiffs, all of whom are citizens of the State of California, and CBS,

25  whom Plaintiffs are informed and believe (and thereon allege) to be a citizen of the

26  State of New York.   The amount in controversy, measured by the value of the

27  object of this litigation to Plaintiffs, exceeds $75,000, exclusive of interest and costs

28

1    in that, among other things, the action involves arbitration claims in which CBS

2    asserts demands well in excess of $75,000 against each individual.

3         14.    Because this is an actual controversy within its original jurisdiction,

4    this Court has the authority under 28 U.S.C. § 2201 and § 2202 to issue the

5    declaratory and injunctive relief sought herein.

6         15.    This Court has personal jurisdiction over Defendant CBS because CBS

7    does business in the State of California and in this District.  Moreover, CBS has

8    chosen to avail itself of this District in connection with disputes related to this

9    action.

10        16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2)

11   because a substantial part of the events or omissions giving rise to the claims

12   occurred in this District, including without limitation CBS's filing of a legal action

13   described herein whereby CBS waived any right to arbitration.

14                        **FACTUAL ALLEGATIONS**

15                **Plaintiffs' Careers In Reality Television**

16        17.    The three Plaintiffs have spent years working up the ladder of reality

17   television.  Mr. Rosen began his career as a "logger" covering baseball on *Fox*

18   *Sports*.  He worked at *Big Brother* in 2001 as a story editor, eventually rising to the

19   title of co-executive producer when he left in 2007.  Since 2007, Mr. Rosen has

20   produced *Hell's Kitchen* for multiple seasons, as well as *Greatest American Dog*

21   and *Gordon Ramsay's Cookalong Live*.  Mr. Rosen has had no involvement with

22   *Big Brother* since 2007.  The new reality television program *The Glass House*

23   represented Mr. Rosen's first chance to act as the "Show Runner" for a series -- the

24   executive producer with key creative responsibilities for the show.

25        18.    Ms. Henson is currently Vice President of Alternative Series at ABC.

26   Before joining ABC in 2008, she worked for 13 years as a freelance producer and

27   journalist.  Ms. Henson was supervising producer on ABC's "*I'm a Celebrity . . .*

28   *Get Me Out Of Here*," and worked on *Extreme Makeover: Wedding Edition, On Air*

1   *with Ryan Seacrest*, as well as many other reality programs, including *Big Brother*,

2   where she acted as supervising producer of the live show in 2005 and 2006.  Ms.

3   Henson has had no connection with *Big Brother* since 2006.  Ms. Henson is, with

4   Mr. Rosen, the co-creator of *The Glass House*.

5         19.    Mr. O'Sullivan specializes in devising elaborate competitions for

6   reality shows.  Known in the industry for his unique talent in this regard, Mr.

7   O'Sullivan first learned to design games by helping his parents run scavenger hunts

8   as a youngster on Long Island.  He honed that skill working on competitions for

9   reality shows like *Battle Dome, Combat Missions, Celebrity Boot Camp, Celebrity*

10  *Mole, Race To The Altar, Hell's Kitchen, The Biggest Loser, Survivor, Amazing Race,*

11  and *Big Brother*.  Mr. O'Sullivan joined Mr. Rosen, whom he has known for years,

12  on *The Glass House*, and served as *The Glass House*'s chief competition designer.

13        20.    The Plaintiffs' experience working at various reality television shows

14  for various networks and producers is typical of the reality show industry.  The

15  work force in reality television is "itinerant," moving from show to show depending

16  on the season (*i.e.*, fall, spring or summer) and the nature of the opportunity.

17  Indeed, when Mr. Rosen worked as a producer on Fox Network's *Hell's Kitchen*, he

18  found himself working with at least 19 former colleagues from *Big Brother*.

19        **CBS Sues The Plaintiffs**

20        21.    In the Spring of 2012, production work began in earnest for a summer

21  premiere of *The Glass House*.  The press began to carry stories about the new show.

22        22.    Based on these press accounts, and apparently nothing else, on May 4,

23  2012, CBS sent a demand letter to The Walt Disney Company's general counsel

24  (Disney is the ultimate parent company of ABC), expressing CBS's belief that the

25  *The Glass House* would infringe on CBS's copyright license in the television show

26  *Big Brother,* and that it would be "impossible" for the show to be produced without

27  the Plaintiffs and others breaching their confidentiality obligations to CBS.  The

28

1    letter also specifically threatened Ms. Henson, Mr. Rosen, and Mr. O'Sullivan with

2    dire consequences if they continued their work on *The Glass House*.

3        23.    Defendants are informed and believe and therefore allege that CBS

4    released the threatening May 4 letter to industry press outlet *The Hollywood*

5    *Reporter*, which carried the message from CBS that any former *Big Brother*

6    employees who worked for *The Glass House* would do so "at their own peril." At

7    least one employee quit the show in response to this public threat.

8        24.    Six days later, on May 10, 2012, CBS filed a complaint (the

9    "Complaint") in the United States District Court for the Central District of

10   California against several corporate entities, including ABC, and against

11   Ms. Henson, Mr. Rosen, and Mr. O'Sullivan, Plaintiffs in this matter. Without ever

12   having seen *The Glass House* or knowing anything about it beyond press clippings,

13   CBS alleged that Plaintiffs were about to violate CBS's copyright license in *Big*

14   *Brother*. CBS further claimed that Plaintiffs had misappropriated supposed "trade

15   secrets" in the *Big Brother* "story producing process," the "technical setup of the

16   *Big Brother* house," and other generic aspects of the *Big Brother* show common to

17   nearly all reality programming.

18       25.    CBS's Complaint sought an injunction to prevent production of *The*

19   *Glass House*. In addition, CBS alleged that Plaintiffs each owed CBS $500,000 in

20   liquidated damages for the alleged misappropriations, based on non-disclosure

21   agreements that Plaintiffs had signed while working at *Big Brother* (the "NDAs").

22   Complaint ¶ 103.

23       26.    CBS also claimed breach of contract against Plaintiffs, based on their

24   supposed inevitable disclosure of undefined "confidential information" in violation

25   of the NDAs. Specifically, CBS alleged that "it is impossible for signatories to the

26   *Big Brother* non-disclosure agreements to develop or produce a show as similar to

27   *Big Brother* as *Glass House* without disclosing or utilizing protected information

28   and thereby breaching their contractual obligations to CBS."

27.     Finally, CBS alleged breach of fiduciary duty against Plaintiffs, arguing that the NDAs created a fiduciary duty in Plaintiffs to keep secret *Big Brother*'s undefined "confidential information."

28.     The NDAs were counter-signed by Our Home Productions, Inc. ("OHPI"), but made CBS a third-party beneficiary, with the right to sue on the NDAs' terms.

29.     Certain NDAs contain a mandatory arbitration provision requiring arbitration of "any and all disputes arising under this Agreement, or any of its terms." The arbitration provision states that in the event the parties arbitrate, "the fact that the arbitration is being conducted [] will be treated as confidential."

30.     Plaintiffs did not reveal either trade secrets or "confidential information" related to *Big Brother* while working at *The Glass House,* and did not violate the NDAs.

### CBS Rejects Arbitration In Favor Of Aggressive Litigation

31.     CBS knew of the NDAs' mandatory arbitration provisions when it filed the Complaint, but deliberately chose not to pursue arbitration.

32.     Instead, for two-and-a-half months CBS pressed the litigation equivalent of war against Plaintiffs in federal court.  Four days after filing its federal court complaint, CBS filed a lengthy *ex parte* application in court  seeking written discovery responses and the collection and production of voluminous responsive documents by May 18.  CBS sought *10 depositions* between May 24 and May 31 -- all the depositions to which CBS would be entitled under the Federal Rules in a normal six-month discovery period.

33.     On May 25, the District Court denied CBS's *ex parte* application, observing that it had "serious questions regarding the scope of the discovery proposed by CBS."  The Court ordered CBS to meet and confer with the defendants concerning discovery and to take any unresolved disputes before the Magistrate Judge.

34.    The parties met-and-conferred again.  The defendants offered limited expedited discovery as well as the opportunity to depose Mr. Rosen so that CBS could meet its requested June 4th date for filing its motion seeking a temporary restraining order.

35.    CBS refused, again demanding voluminous documents and that multiple depositions take place immediately.

36.    On May 31, 2012, CBS filed another *ex parte* application, this time with the Magistrate Judge.  CBS requested a literally impossible document production schedule, with productions due before the opposition was even filed, and three days of depositions from June 2 to June 5.

37.    The Magistrate Judge denied CBS's application, but ordered the defendants to give CBS the discovery that the defendants had offered in the meet-and-confer process.  The Magistrate Judge permitted a one-day deposition of Kenny Rosen, to take place on a Sunday.

38.    On Sunday, June 3, 2012, CBS deposed Mr. Rosen.  CBS spent most of the deposition asking questions related to its trade secret and breach of contract claims.

39.    On June 7, 2012, CBS filed its *ex parte* application for a temporary restraining order.

40.    On June 13, 2012, CBS, again seeking more discovery, filed a motion to compel with the Magistrate Judge.  CBS still wanted a huge document production, as well as another day of deposition from Mr. Rosen.

41.    On June 15, the Court held a hearing on CBS's TRO application.  The Court began the hearing by stating its tentative ruling to deny the application because CBS was unlikely to succeed on either its copyright claim or on any of its claims related to the trade secrets or the NDAs.  After oral argument the Court took the matter under submission.

42.     Moments after leaving the courtroom, CBS issued a statement to the press plainly designed to intimidate Plaintiffs and anyone else working on *The Glass House.* In it, CBS made clear its intention to pursue litigation against Plaintiffs until the bitter end.  "Win, lose or draw on the temporary restraining order, we intend to proceed with our claims against Disney/ABC for copyright infringement and misappropriation of trade secrets over The Glass House . . . . *At the same time, we will move forward with our individual claims for liability and liquidated damages* against any current *The Glass House* producer who violated their Big Brother confidentiality agreements."  (emphasis added).

43.     On June 21, 2012, the Court issued a detailed order denying CBS's *ex parte* application for a TRO.  Exh. A, attached hereto.  In a lengthy analysis, the Court found that CBS had failed to demonstrate substantial similarity between *Big Brother* and *The Glass House*, as required to state a copyright claim.  *Id.* at 5-12.

44.     As for the trade secrets claim, "the Court entertain[ed] serious doubts as to CBS's ability to demonstrate either [1] that the purported trade secrets qualify for protection; or [2] that Defendants are actively misappropriating any such trade secrets." *Id.* at 13.  The Court noted that much of the "generic material" CBS characterized as trade secrets was available on the Internet, *id.*, and that the "filming, editing and production techniques which CBS claims as trade secrets" resembled "techniques . . . commonplace in the production of reality television programming." *Id.* at 14.

45.     The next day, CBS issued another press statement, again promising to pursue litigation against Plaintiffs to the bitter end:  "This is only one preliminary step in a long road; we will now aggressively move two steps forward.  We intend to proceed with our claims against Disney/ABC for copyright infringement and misappropriation of trade secrets. *At the same time, we will move forward with our individual claims for liability and liquidated damages* against any current 'Glass

1  House' producer who violated their 'Big Brother' confidentiality agreement. . . . ."

2  (emphasis added).

3       46.    On June 26, 2012, the Magistrate Judge denied CBS's motion to

4  compel additional discovery.  The Magistrate Judge noted that the so-called

5  "secrets" that CBS claimed Plaintiffs had disclosed in violation of the NDAs "either

6  were already known in the business, were readily capable of reverse engineering,

7  and were not adequately protected as trade secrets."  The Magistrate Judge

8  cautioned CBS that it "may wish to sharpen its trade secret disclosure now that it

9  has the benefit of the District Court's Order.  *However, CBS's next attempt must be*

10  *its last.*" (Emphasis added).

11  **CBS Retreats From The Federal Forum And Belatedly Seeks Arbitration**

12       47.    Plaintiffs and ABC then acted to end CBS's frivolous suit.  On July 2,

13  2012, they filed a motion to dismiss all CBS's claims with prejudice.  CBS asked

14  for an extension of time to respond to the motion.  Plaintiffs and ABC agreed, and

15  the new agreed-upon response date was July 30, 2012.

16       48.    On July 30, 2012, instead of filing an opposition to the Motion to

17  Dismiss, CBS filed a first amended complaint ("FAC").  Among other things, the

18  FAC dropped all claims against Plaintiffs in this case.

19       49.    The same day, July 30, 2012,  CBS for the first time demanded

20  arbitration with the Plaintiffs.

21       50.    The claims in CBS's Arbitration Demand are nearly identical to those

22  CBS litigated against Plaintiffs in its Complaint.  CBS summarizes its Demand as

23  follows: "[Rosen, Henson, and O'Sullivan] were formerly employed by CBS in

24  connection with Big Brother and in that capacity were given access to CBS's trade

25  secrets and confidential information.  They signed an agreement not to disclose

26  those trade secrets, but breached that agreement by turning over CBS's confidential

27  information, which they and ABC have used in developing and producing *Glass*

28  *House*."

1   51.   The Demand freely cites to information CBS obtained from litigation

2   in this Court.  For instance, when the Demand asserts that "Respondent Kenny

3   Rosen has admitted under oath to disclosing such information," the Demand is

4   referring to the deposition that CBS took as part of its discovery practice before this

5   Court.

6   52.   In the meantime, ABC met and conferred with CBS on August 10th

7   regarding ABC's upcoming motions in the federal court litigation.  ABC warned

8   CBS that this time it intended to file not only a motion to dismiss the operative

9   complaint with prejudice, but also a special motion to strike CBS's trade secret

10   claims under California's anti-SLAPP statute.  Pursuant to governing law, the

11   corporate defendants' victory on the anti-SLAPP motion would automatically result

12   in an award of attorneys fees against CBS.  On August 17, 2012, on the last

13   business day before the Monday on which ABC planned to file its motions, CBS

14   voluntarily dismissed its federal court action pursuant to Federal Rule 41(a)(1).

15   **CBS Breaches The NDAs**

16   53.   The same day it dismissed its lawsuit against ABC, CBS issued yet

17   another press statement, in an attempt to save face.  Two aspects of this statement

18   are of note:  first, by issuing the release, CBS acted as if the confidentiality

19   provisions in the NDAs simply do not apply when CBS has no use for them.  CBS

20   stated: "[W]e filed in federal court this morning a voluntary dismissal without

21   prejudice of our claims against ABC.  The contract and trade secrets claims against

22   former Big Brother producers for violating their confidentiality agreements *will*

23   *continue separately in arbitration*."  (Emphasis added.)

24   54.   CBS's public reference to the "fact of arbitration" was an egregious

25   breach of the NDA's confidentiality requirement with respect to arbitration.

26

27

28

- 12 -

1

## The NDAs

2      55.   The NDAs purport to cover undefined "trade secrets" learned while

3  working on *Big Brother*, although during Plaintiffs' tenure at *Big Brother,* CBS

4  never identified any so-called *Big Brother* "trade secrets."

5      56.   The NDAs also cover so-called "confidential information." The NDAs

6  define "confidential information" to include *Big Brother* content not yet broadcast,

7  such as, for example, "any Series plans or designs, any challenges or activities in

8  which the contestants will participate, [and] . . . the outcome of the Series or any

9  episode of the Series." The NDAs expressly acknowledge this information loses its

10  confidentiality after the show airs. The NDAs also include a generic, undefined

11  category of "other confidential and/or proprietary information."

12      57.   The provisions of each NDA pertaining to "confidential information"

13  expire—at the latest—three years after the airing of the season of *Big Brother*

14  during which the NDA was signed.

15      58.   Ms. Henson and Mr. Rosen last signed NDAs for *Big Brother* in 2006

16  and 2007 respectively.

17      59.   By their terms, Ms. Henson's NDAs as applied to "confidential

18  information" expired in 2009.

19      60.   By their terms, Mr. Rosen's NDAs as applied to "confidential

20  information" expired in 2010.

21                        **FIRST CLAIM**

22     **(Request for Declaratory Relief Concerning Waiver of Arbitration)**

23      61.   Plaintiffs incorporate by reference paragraphs 1 through 61 above, as

24  though fully set forth herein.

25      62.   CBS has waived its right to arbitrate any disputes with Plaintiffs

26  arising from the NDAs.

27      63.   CBS was aware of the arbitration provisions in the NDAs with

28  Plaintiffs when it initiated litigation on May 10, 2012.

- 13 -

64.    On May 10, 2012, CBS initiated litigation in this District against these same Plaintiffs asserting, among other claims, the same claims concerning the same facts that CBS now asserts in its Demand.

65.    CBS's acts are inconsistent with the right to arbitrate.  CBS first brought its damages claims related to the NDAs against Plaintiffs in a non-arbitration forum.  After promising Plaintiffs that it would dismiss all damages claims against them in May 2012 based on language in the NDAs, CBS proceeded to do the opposite -- vigorously pursuing *damages* claims against Plaintiffs and demanding a jury trial in federal court.  CBS also failed to preserve (or even mention) its right to arbitration in any of its papers before the Court, as required by the state statute under which it claimed to be proceeding, and instead engaged in extensive, highly publicized litigation of the merits of its claims through various motions and a TRO.

66.    CBS only dismissed its damages claims against Plaintiffs several months later, when the hopelessness of CBS's cause became apparent to everyone. By waiting till the very end of July 2012 to dismiss its claims, CBS engaged in bad faith forum shopping while taking full advantage of its opportunity to preview Plaintiffs' best arguments.

67.    CBS repeatedly invoked the powers and machinery of litigation in the federal action.  CBS *chose* to bring the previous action in court rather than in arbitration.  And, once in court, CBS conducted rapid and extremely aggressive motion practice, *ex parte* and otherwise, which resulted in Plaintiffs briefing at length their positions on a number of disputes that CBS raised, including the ones CBS decided to allege again in its Demand.

68.    CBS also sought sweeping discovery from Mr. Rosen, Ms. Henson, and Mr. O'Sullivan on an expedited basis.  In so doing, CBS attempted to force Plaintiffs to provide substantial information, including several hours of oral

1   deposition testimony, that CBS has employed in the Demand and presumably

2   intends to use in the arbitration.

3          69.   CBS's delay has misled, affected, and prejudiced Plaintiffs by

4   depriving the Plaintiffs of the advantages of arbitration.  CBS's previous litigation

5   required Plaintiffs to incur unnecessary expense and effort during litigation,

6   undergo an extremely public and contentious dispute, provide CBS with

7   information it would not otherwise have had for use in preparation of its arbitration

8   demand and proceedings, and allow CBS the opportunity to view Plaintiffs'

9   litigation responses and arguments in advance of the arbitration.

10         70.   Plaintiffs seek a judicial declaration regarding the parties' rights as

11  they relate to each other with respect to the NDAs.  Specifically, Plaintiffs seek a

12  declaration that CBS has waived any and all rights it may have had to require

13  Plaintiffs to submit to arbitration for disputes concerning the NDAs.

14         71.   An actual controversy has arisen and bona fide dispute exists between

15  Plaintiffs and CBS in that CBS is asserting a purported right to arbitrate disputes

16  under the NDAs and Plaintiffs contend that right is waived based on CBS's conduct

17  during its litigation in this District.

18         72.   A declaratory judgment is necessary and appropriate at this time to

19  determine the rights and obligations of Plaintiffs and CBS, and to prevent CBS

20  from asserting that it has claims under the NDAs that may proceed in arbitration.

21         73.   Plaintiffs seek a judicial determination of the foregoing controversy

22  and a declaration by the Court that CBS has waived its right to arbitration.

23                          **SECOND CLAIM**
                **(Request for Declaratory Relief That Plaintiffs**
24              **Did Not Breach Non-Disclosure Agreements)**

25         74.   Plaintiffs incorporate by reference paragraphs 1 through 74 above, as

26  though fully set forth herein.

27         75.   Plaintiffs did not breach any of their NDAs with CBS.

28

                                - 15 -

76.     Plaintiffs did not disclose or use any confidential information or trade secrets, as provided in the NDAs.

77.     With respect to "confidential information," the NDAs executed by Rosen and Henson expired as of 2009 and 2010, respectively.

78.     In addition, any obligations under the NDAs concerning "confidential information" have expired since the seasons of *Big Brother* that Plaintiffs worked on have all aired.  Any "confidential information" Plaintiffs may have learned is therefore no longer confidential.

79.     Moreover, to the extent CBS seeks to use the NDAs to restrict employee mobility, the NDAs are unenforceable under California law.

80.     The NDAs are also unenforceable with respect to the liquidated damages provision that CBS is attempting to assert as a penalty in its arbitration proceeding against Plaintiffs.

81.     The $500,000 liquidated damages provision in the NDAs was unreasonable under the circumstances existing at the time Plaintiffs signed it because, among other things, the liquidated damages amount bears no reasonable relationship to any damages CBS could have reasonably expected to suffer from a breach of the type that CBS has accused Plaintiffs of committing.  In addition, CBS and the production company producing *Big Brother* had vastly superior bargaining power to Plaintiffs, the NDAs are form contracts that Plaintiffs would not have negotiated, and Plaintiffs were not represented by counsel.

82.     Consequently, Plaintiffs also seek a judicial declaration that Plaintiffs have not, in any event, breached the NDAs, that the NDAs are otherwise unenforceable, and/or that CBS is not able to enforce the NDAs against Plaintiffs.

83.     An actual controversy has arisen, and a bona fide dispute exists, between Plaintiffs and CBS as CBS has asserted in both litigation and arbitration that Plaintiffs breached their NDAs with CBS.  CBS is currently attempting to assert claims against Plaintiffs predicated upon violation of the NDAs.

1    84.    A declaratory judgment is necessary and appropriate at this time to

2 determine the rights and obligations of Plaintiffs and CBS, and to prevent CBS

3 from continuing to assert breach of these NDAs in litigation, arbitration, or any

4 other such forum which CBS may attempt to elect.

5                                **THIRD CLAIM**

6                             (Breach of Contract)

7    85.    Plaintiffs incorporate by reference paragraphs 1 through 85 above, as

8 though fully set forth herein.

9    86.    The NDAs provide that "the fact that the arbitration is being

10 conducted[] will be treated as confidential and will not be disclosed to any third

11 party to such proceedings . . . ."

12    87.    CBS breached this provision by announcing to the press on August 17,

13 2012 that it was pursuing damages against Plaintiffs in arbitration.

14    88.    CBS's breach of the confidentiality provision damaged Plaintiffs'

15 reputations and careers in an amount to be determined at trial.

16    89.    If the Court finds the NDAs' liquidated damages provision enforceable

17 (which Plaintiffs allege it should not), then that provision should be applied in

18 assessing the damages each Plaintiff sustained by reason of CBS's breach.

19                               **FOURTH CLAIM**

20                         **(Request for Injunctive Relief)**

21    90.    Plaintiffs incorporate by reference paragraphs 1 through 90 above, as

22 though fully set forth herein.

23    91.    Plaintiffs will suffer irreparable harm for which they lack an adequate

24 remedy at law absent preliminary and permanent injunctive relief restraining CBS

25 from proceeding with arbitration against them based upon the NDAs.  Such

26 unlawful proceedings would also result in a multiplicity of judicial proceedings and

27 waste, and would render the declaratory judgment Plaintiffs seek here ineffectual.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PRAYER FOR RELIEF

WHEREAS, Plaintiffs pray for judgment against CBS as follows:

    a.  For a judicial declaration that CBS has waived any right to arbitration it may have had against the Plaintiffs under the NDAs;

    b.  For a further judicial declaration that Plaintiffs have not breached the NDAs, that the NDAs are otherwise unenforceable, and/or that CBS is not able to enforce the NDAs against Plaintiffs.

    c.  For a preliminary and permanent injunction barring CBS from seeking or proceeding further with arbitration of its disputes with Plaintiffs related to the NDAs;

    d.  For Plaintiffs' damages from CBS's breach of the confidentiality provision contained in the NDAs;

    e.  For Plaintiffs' costs of suit incurred herein; and

    f.  For any other and further relief that the Court may deem just and proper.

1   DATED: November ___, 2012          Munger, Tolles & Olson LLP

2                                           GLENN D. POMERANTZ
                                            JONATHAN E. ALTMAN
3                                           CAROLYN HOECKER LUEDTKE

4

5                                      By: _____
                                            GLENN D. POMERANTZ
6
                                       Attorneys for Plaintiffs
7
                                       Kenny Rosen, Corie Henson, and Michael
8                                      O'Sullivan

9

10                                     Early Sullivan Gizer Wright & McRae LLP

11                                          DEVIN A. MCRAE

12

13                                     By: _____
                                            DEVIN A. MCRAE
14
                                       Attorneys For Plaintiffs
15
                                       Kenny Rosen, Corie Henson, and Michael
16                                     O'Sullivan

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Renee Fisher | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**      **(In Chambers)**

### ORDER RE: APPLICATION FOR TEMPORARY RESTRAINING ORDER

## I. INTRODUCTION

For the past 13 years, CBS Broadcasting, Inc. ("CBS") has aired a so-called "reality" television program called Big Brother. The action in Big Brother takes place on a sound stage constructed to resemble a house, where 12 to 14 participants live in full view of cameras that are placed in every room, operate day and night, and record all of the events and interactions that occur among the participants. Within the rules established at the beginning of a season, the participants compete to see who can outlast the others in a series of eliminations ("evictions"), which occur once per week over an approximate 12-week period. The last person left in the "house" wins a cash prize. Like most reality programming, Big Brother has no set characters, plot, dialogue, or sequence of events. Rather, its "drama" arises from the extemporaneous interactions among contestants who are periodically required to participate in various activities and competitions with the objective of avoiding elimination. Fans of the show hold their breath as contestants are evicted, one by one, at the end of each week.

Defendant American Broadcasting Companies, Inc. ("ABC") has developed a competing show which it calls "The Glass House" that takes place in a similar setting with a like number of contestants. As with Big Brother, the idea behind the show is to put the contestants in a similar setting with a similar motivation – to win a cash prize by being the last contestant in the house at season's end. As with Big Brother, cameras will record the interaction among contestants in the hope that, once thrown together in close quarters with no escape, drama will ensue.

LINK: 41

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

CBS now claims that Glass House infringes its copyright in Big Brother and brings suit against ABC, and a number of other institutional and individual defendants involved in the production of Glass House[1], and further contends that they have misappropriated CBS's trade secrets in the Big Brother production.  CBS has applied to the Court for: (1) a temporary restraining order to enjoin the production and broadcast of Glass House; (2) an order that Defendants return all confidential, proprietary materials related to Big Brother; and (3) an order to show cause why a preliminary injunction should not issue pending the litigation of this lawsuit.  CBS contends that, what it characterizes as the myriad similarities between Glass House and Big Brother, coupled with the Individual Defendants' prior access to Big Brother source material demonstrates a likelihood of copyright infringement.  Moreover, CBS alleges that ABC's "poaching" of numerous Big Brother employees and its purported use of proprietary production techniques employed on Big Brother give rise to claims for misappropriation of trade secrets.  Defendants oppose the application on the principal grounds that CBS has failed to demonstrate either the requisite "similarity" between the two shows, or that any of the purported trade secrets qualify for protection under California law.

After reviewing the parties' arguments, the evidentiary record, and all relevant authorities, the Court concludes that the application should be **DENIED**.  As the Court discusses in more detail below, it has concluded that, while it cannot say that CBS will not prevail at trial, it has concluded that success on the merits is unlikely.  The evidence before the Court indicates that, under the substantial similarity test, CBS is not likely to prove that Glass House has misappropriated protectable elements of Big Brother.  Moreover, the evidence indicates to the Court that Big Brother's alleged trade secrets were either already known in the business (e.t., banks of monitors in multi-camera productions), were readily capable of "reverse engineering" based on information disclosed in the public domain (e.g., camera angles), or were not adequately protected as trade secrets (e.g., tours of the Master Control Room).  Furthermore, as the Court noted at the hearing, CBS has failed to persuade the Court that it will suffer immediate and irreparable injury if Glass House airs, and ABC and its co-defendants have persuaded the Court that the balance of equities tips significantly in their favor.  Finally, given the Court's view of the strength of CBS's claims, the Court declines to issue an order to show cause.

## II. BACKGROUND

---

[1] The other defendants are: Walt Disney Company; Disney Enterprises, Inc.; ABC, Inc. dba Disney ABC Television Group; Keep Calm and Carry On Productions, Inc. ("Keep Calm"); and Kenneth Rosen; Corie Henson; and Michael O'Sullivan ("Individual Defendants").

**LINK: 41**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

Big Brother is a successful "special living environment" reality television show broadcast by CBS since 2000. (Declaration of Jennifer Bresnan ("Bresnan Decl.") ¶ 7.) The show revolves around "14 contestants [who] liv[e] together in a large house, isolated from the outside world, where they are filmed continuously by approximately 50 cameras . . . [as they] engage in tasks and competitions, and are periodically 'evicted' from the house through voting by their co-contestants or, in the first season, by viewers." (Declaration of Scott A. Edelman ("Edelman Decl."), Ex. B [Expert Declaration of Jeff Rovin] ("Rovin Decl.") at 7.) The premise behind Big Brother, according to CBS, is "unlike anything else on television." (App. at 3.) In short, the show "allows outside viewers to watch the unscripted interaction of its cast members, to witness how contestants interact, strategize, and ally with one another in pressure-filled competitions and evictions, all while these contestants are physically sealed off from the outside world and unhindered in how they act towards each other . . . ." (Id.)

Glass House is a reality television show developed by ABC, set to air on June 18, 2012, which shares a number of these elements with Big Brother. (Edelman Decl., Ex A [Deposition of Kenneth Rosen] ("Rosen Deposition") at 153, 15–16.) Like Big Brother, Glass House will feature twelve (12) to fourteen (14) contestants living together in a house, where they will be filmed around the clock engaging in various activities and competitions from which it is hoped that plots and sub-plots will develop. (Id. at 178–81.) Viewers will have input as to a number of the show's elements, most importantly in the process of determining which contestants are eliminated from the competition.

These similarities, according to CBS, are unsurprising in light of the fact that ABC has hired numerous former Big Brother staff to work on Glass House. Approximately 26 of Glass House's ongoing staff members formerly worked on Big Brother, including Kenneth Rosen, Glass House's "show runner," who is responsible for the day-to-day operation of the series. (Id. at 257–260.)[2] CBS makes much of the fact that, in his June 1, 2012 deposition, Rosen admits that he showed the Big Brother "Houseguest Manual," a compilation of rules for Big Brother contestants, to a production coordinator on Glass House, and asked that its contents be re-typed and sent to in-house counsel at ABC. (Id. at 94–104.) Further, Rosen concedes that he

---

[2] It appears that Rosen's understanding of the size of the crew was mistaken. His testimony suggested that about half of the staff had previously worked on Big Brother. More recent information suggests that the production involves more than 100 staff members, 26 of whom once worked on Big Brother. However, as Rosen notes in his deposition, most of those former Big Brother employees have not worked on that show for several years, and in the interim have been employed on other reality television programs. (Declaration of Timothy Bock ("Bock Decl.") ¶ 5; Rosen Deposition at 257–262.)

LINK: 41

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

consulted an old "Master Control Room" schedule for Big Brother when determining how many "story positions" he would need to hire for Glass House. (Id. at 90–92.)

According to CBS, much of Big Brother's "unique success" lies in its "broadcast schedule, which involves recording, editing, and broadcasting episodes during the competition, within 48 hours of the events actually happening." (App. at 7.)[3]  That quick turnaround is made possible by a number of filming, editing and production techniques, such as the use of multiple production teams separately assigned to monitoring major story lines; streamlined methods of coordination between editors and story producers; and the cataloging of all house activities in searchable databases. (Bresnan Decl. ¶ 16; Declaration of Don Wollman ("Wollman Decl.") ¶¶ 10–12.) CBS argues that these techniques, developed over the course of Big Brother's thirteen (13) seasons, constitute protectable trade secrets, and that Defendants have misappropriated these trade secrets by employing the same or similar techniques in the production of Glass House.

CBS filed its complaint on May 10, 2012, bringing claims for [1] copyright infringement; [2] trade secret misappropriation; [3] unfair competition; [4] breach of contract; [5] breach of fiduciary duty; [6] inducing breach of contract; [7] inducing breach of fiduciary duty; [8] conversion; [9] conspiracy; and [10] aiding and abetting. (Compl.) After securing expedited discovery in anticipation of this motion, CBS filed its application on Thursday, June 7. (App.) The Court gave Defendants until Monday, June 11 to oppose, and held a hearing on the matter on June 15.

### III. DISCUSSION

#### A. LEGAL STANDARDS GOVERNING PRELIMINARY RELIEF

The standard for a temporary restraining order is identical to the standard for a preliminary injunction. Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc., 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009) (citing Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995)). A plaintiff seeking preliminary relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Doe v. Reed, 586 F.3d 671, 676 (9th Cir. 2009) (quoting Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008)). The elements of this test are "balanced, so that a stronger showing of one element

---

[3] As discussed below, these elements are irrelevant to the copyright analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

may offset a weaker showing of another." Alliance for Wild Rockies v. Cottrell, 622 F.3d 1045, 1049–50 (9th Cir. 2010). Accordingly, a court may grant temporary relief where a plaintiff demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." Id. at 1052 (internal quotations omitted).

**B. COPYRIGHT INFRINGEMENT**

**1. COPYRIGHT ELEMENTS**

"To establish copyright infringement, a plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" L.A. Printex Industries, Inc. v. Aeropostale, Inc., 676 F.3d 841, 846 (9th Cir. 2012) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). Because the parties do not dispute that CBS owns copyright interests in Big Brother, and there is really no dispute that Glass House is similar in certain respects to Big Brother, the claim turns on CBS's ability to demonstrate that ABC's Glass House copies protectable elements of Big Brother.

"'Because direct evidence of copying is not available in most cases,' a plaintiff can establish copying by showing (1) that the defendant had access to the plaintiff's work and (2) that the two works are substantially similar." L.A. Printex, 676 F.3d at 846 (quoting Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996)). Although the parties disagree as to the legal effect of establishing the first element of the claim, the broadcast of the program and the employment of several members of the Glass House team on earlier seasons of Big Brother eliminate any dispute that Defendants had "access" to the copyrighted work.[4] Moreover, given the similarity of the concepts for the two programs, the Court does not doubt that some copying has occurred in this case. But the question for determination is whether there is substantial similarity between Big Brother's protected elements and elements of Glass House.

___

[4] Relying on Swirsky v. Carey, CBS contends that because the Individual Defendants enjoyed a "high degree of access" to Big Brother, the Court should "require a lower standard of proof of substantial similarity." 376 F.3d 841, 844 (9th Cir. 2004). This argument invokes the "inverse ratio rule" which has been questioned, if not discredited, in more recent decisions. See Funky Films, Inc. v. Time Warner Entertainment, Co., 462 F.3d 1072, 1081–82 (9th Cir. 2006) ("No amount of proof of access will suffice to show copying if there are no similarities.") (quoting Krofft Tele. Prods. v. McDonald's Corp., 562 F.2d 1157, 1172 (9th Cir. 1977)). See also Zella v. E.W. Scripps Co., 529 F.Supp.2d 1124, 1133 (C.D. Cal. 2007) ("[E]ven if access is present, Plaintiffs cannot state a claim if substantial similarity is lacking.") The "inverse ratio rule" actually stands logic on its head: a high degree of similarity would constitute strong circumstantial evidence of access; access says nothing about whether two works bear any similarity to each other which must be determined solely by a comparison of the elements of the two works.

**LINK: 41**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

### 2. THE SUBSTANTIAL SIMILARITY TEST

In the Ninth Circuit, the "substantial similarity" inquiry entails both an "extrinsic" and an "intrinsic" test, both of which must be satisfied. Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003). Whereas the intrinsic test "focuses on 'whether the ordinary, reasonable audience' would find the works substantially similar in the[ir] total concept and feel", Benay v. Warner Bros. Entm't, Inc., 607 F.3d 620, 624 (9th Cir. 2010), and is typically the province of the jury, "the extrinsic test is an objective measure of the 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events,'" Rice, 330 F.3d at 1174 (quoting Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994)).

As the test suggests, copyright law does not protect abstract ideas but rather the concrete expression of those ideas. 17 U.S.C. § 102(b); Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. (2002); Berkic v. Crichton, 761 F.2d 1289, 1292 (9th Cir. 1985); Warner Bros. Inc. v. American Broadcasting Co., Inc., 654 F.2d 204, 208 (2d. Cir. 1981). Unprotectable elements also include general plot ideas and "scenes à faire," which are scenes that flow naturally from unprotectable basic plot premises and "remain forever the common property of artistic mankind." Metcalf, 294 F. 3d at 1074. On the other hand, "protectable expression includes the specific details of an author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" Id. Accordingly, the Court must closely review any claim of infringement to determine whether the alleged infringing work has appropriated only an abstraction such as generalized themes, ideas and concepts, or something more concrete that reflects the creator's particularized expression of the underlying ideas. As the Second Circuit has noted, this is a perplexing issue on which the Judge Learned Hand opined more than 80 years ago:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d. Cir. 1930).

There are additional limitations on the scope of copyright protection. First, copyright does ***not*** protect hard work, industriousness, persistence, perseverance, tenacity or

Case 2:12-cv-04073-GAF-JEM   Document 113   Filed 06/21/12   Page 7 of 16   Page ID #:2921

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

resourcefulness.  Feist Publications, Inc., v. Rural Tele. Serv. Co., 499 U.S. 340, 350 (1991).  It is not a doctrine based on fairness; it does not reward a creator for his or her labor, even though the creator's labor, particularly in works of non-fiction, may be the principal value added by the author because, like hard work, the facts on which the work is based are not protectable.  Id.  Why?  The Supreme Court explains:

> [T]his is not some unforeseen byproduct of a statutory scheme.  It is, rather, the essence of copyright, *and a constitutional requirement*.  The primary objective of copyright is not to reward the labor of authors, but to promote the Progress of Science and useful Arts.  To this end, copyright assures authors the right to their original expression, *but encourages others to build freely upon the ideas and information conveyed by a work*.  This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship.

Id. at 349-350 (emphasis added).  See also Narell v. Freeman, 872 F. 2d 907, 910 (9th Cir. 1989) ("[T]he scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.")  Similarly, copyright protection does not extend to any "procedure, process, system, [or] method of operation."  17 U.S.C. § 102(b); Barris/Fraser Enterprises, v. Goodson-Todman Enterprises, Ltd., 1988 WL 3013 * 3 (S.D.N.Y. Jan. 4, 1988).

### 3. BIG BROTHER'S UNPROTECTABLE PROCESSES AND PROCEDURES

At the hearing on this application, the Court noted that the moving papers conflated the copyright and trade secret analysis, in part, it appeared, to make the copyright argument appear more substantial than an argument focusing only on the properly considered elements.  Further review and reflection confirms the Court's impression.  The Court therefore starts with a delineation of several of the supposed copyright elements that must be disregarded.

CBS touts a number of procedures, processes and techniques that purportedly constitute protectable elements of Big Brother and included them in charts used at the hearing to support its copyright claims.  These include: (1) the number and placement of cameras used to record the activities of the "cast" of the show; (2) the fact that the video streams live to the internet; (3) the fact that contestants are housebound for some or all of the period during which the show is shot; (4) the timing and scope of the post-production work; (5) the fact that the post-production does or does not involve editing of content; (6) the fact that shows commence airing before the final episode has been shot; (7) the size of the production crew and the array of positions that are held by crew members.  While these various procedures and processes may ultimately have an impact

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

on the expressive elements of the show, 17 U.S.C. § 102(b) establishes that they are not within the ambit of copyright protection. The Court will therefore disregard those procedures, processes and techniques in its copyright analysis.

### 4. THE EXPRESSIVE ELEMENTS OF BIG BROTHER

It is apparent from a review of the authorities submitted by both parties that the nature of the work at issue is critical to the analysis of the substantial similarity test. In that regard, it appears that CBS has attempted to fit the reality show square peg into the fictional round hole described in cases like Metcalf and Berkic in an effort to enhance the copyright claim. Using the substantial similarity test as articulated in such cases, CBS contends that the key "articulable similarities" between the two shows are the "plot, themes, dialogue, mood, setting, pace, characters, and sequences of events." (App. at 14.) Because Big Brother does not, as a concept, readily exhibit any of these elements, ABC is more than happy to hew to this line of analysis because it suits its objective. Programming like Big Brother resists this traditional analysis because the "drama" that occurs in the voyeuristic variant of reality television develops, by design, in an unpredictable way. Until the cameras begin to record, there is no plot, there is no dialog, there is no pace or sequence of events, and there are no fixed characters because there is no author. There is a setting, which is hardly novel, and some general ideas regarding the structure of the show, but little else.

When scrutinized closely, and when the non-protectable elements are eliminated from consideration, CBS's argument amounts to a claim of copyright in the format or template that underlies Big Brother. CBS essentially seeks copyright protection in a voyeuristic reality show involving a group of 12 to 14 participants who compete for a grand prize while being subjected to round-the-clock observation while locked in a sound stage designed to give the appearance of a house. To avoid the risk that the interactions among the participants becomes boring and uninteresting, the participants are given periodic challenges that earn privileges or cost them sanctions and, hopefully, create plot elements. As the season wears on, the drama intensifies as participants are voted off ("evicted") by the other contestants until only one is left and declared the winner. The question is whether this format contains a sufficient number of concrete, expressive elements to merit copyright protection – that is, whether CBS seeks to protect an idea or abstract concept or the concrete expression of that concept.

Clearly, CBS could not obtain copyright protection for the concept of reality programming, or the concept of voyeuristic reality programming. While the concept CBS attempts to protect is more concrete than these broad abstractions, it is still quite general and in

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

any event consists of unprotectable elements. CBS's repeated emphasis on the two shows' "voyeuristic" feel and "unscripted" character falls short of establishing any concrete expressive elements, let alone any protectable elements. See, e.g., Berkla v. Corel Corp., 66 F.Supp.2d 1129, 1140 (E.D. Cal. 1999) ("Just as undisputed is the proposition that ideas, techniques, or processes are not protectable under copyright law – only the original expression of the idea.") (citing Sega Enterprises v. Accolade, Inc., 977 F.2d 1510, 1523 (9th Cir. 1992)). Likewise, the components of the format are not new or unique to Big Brother. For example, according to some sources, the idea of a voyeuristic television program depicting strangers thrown together in the same environment for an extended period of time while their interactions were recorded was pioneered in the 1991 Dutch television series "Nummer 28." The concept was extended in the MTV series "The Real World," which CBS's expert describes in his report as an outgrowth of "American Family" without mentioning "Nummer 28." Thus, the idea of putting a group of people into an environment where their every move was observed is not unique or original with Big Brother. To be sure, there is no evidence that any prior show insisted that the contestants be housebound, but that is more a procedure employed to induce interesting behavior than an element of expression in and of itself. Nor is the idea of a contest among participants an element that is unique to Big Brother. In most reality shows, the contestants are vying for some grand prize. Likewise, the idea of lesser events and competitions is also a staple of reality programming for obvious reasons – competition creates conflict; conflict creates drama; and drama (hopefully) creates interest, viewers and revenue.

The Court's conclusion that CBS will struggle to prove that it can establish protectable, concrete expressive elements in Big Brother finds support in Jeffrey Rovin's report. Rovin's comparisons between the two shows' actual "expression" reflects a high level of abstraction such as when he asserts that the plots of both shows involve "house guests compet[ing] for privileges and a grand prize while risking expulsion." (Rovin Decl. at 24.) But there is nothing about being a house guest, competing, and risking expulsion that Big Brother can claim to be unique or original to the show. Indeed, competition and expulsions are the life blood of reality programming. Likewise, he notes that both Big Brother's and Glass House's "characters," who are really nothing more than contestants in a game show, are of "varied gender, age, and ethnicity." Does Rovin really contend that a diverse set of contestants constitutes an array of "characters" that are drawn with sufficient particularity that they warrant copyright protection? The Court has found no support in any case law for that proposition. Rovin also opines that, from among the contestants, some are "natural leaders and others . . . are natural whiners." (Id.) Well, maybe it will work out that way, but no one can say for sure until the door closes, the cameras are turned on, and the producers watch to see what develops. Moreover, the presence of leaders, followers and whiners is hardly an idea that would warrant copyright protection. And with regard to purported thematic elements, Rovin can do no more than surmise that episodes

LINK: 41

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

will be "about trust, betrayal, ambition, disappointment, bonding, competitiveness, and affection." (Id.) But saying that is to say that anything can happen, and themes that are common to all literature for all time may arise during recording. Finally, Rovin concedes that there really is no established dialogue because "there are no scripts, just improvisation." (Id.)

The very language used by Rovin routinely de-emphasizes similarity: the shows' characters are "varied"; the dialogue is "improvised"; and, most tellingly, the shows are aimed at eliciting nearly every human emotion that one might expect to find in anything resembling the dramatic arts. In short, Rovin has identified nothing but particular tropes of the reality television genre, each of which is too generic to merit copyright protection.[5] Courts addressing the issue, including this one, have unanimously found such arguments wanting. See, e.g., CBS Broadcasting, Inc. v. ABC, 2003 U.S. Dist. LEXIS 20258, at *22 (S.D.N.Y. Jan. 13, 2003) (finding that, with respect to "Survivor" and "I'm a Celebrity, Get Me out of Here!" reality television shows, "[e]ven if . . . the[ir] elements were congruent, that congruence, without more, would not establish substantial similarity in the copyright meaning because it would violate the cardinal rule of copyright that copyright does not protect an idea but only the expression of an idea."); Bethea v. Burnett, 2005 WL 1720631, at *11 (C.D. Cal. Jun. 28, 2005) ("At the most abstract level, or at the level of 'ideas,' there is some similarity between [the reality shows] C.E.O. and The Apprentice. For example, Plaintiffs claim that the 'plot' of both reality television programs is similar because both programs depict a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation . . . . However, Plaintiffs' alleged similarity is nothing more than a string of generic 'ideas' which is not protected by copyright law."); Zella, 529 F.Supp.2d at 1138 ("Each factor relevant to the extrinsic test militates so strongly in the CBS Defendants' favor that no reasonable jury could conclude that Rachael Ray and Showbiz Chefs are substantially similar."); Milano v. NBC Universal, Inc., 584 F.Supp.2d 1288, 1296 (C.D. Cal. 2008) (finding reality television show "The Bigger Loser'"s incorporation of generic elements of prior treatment insufficient to give rise to "substantial similarity").

Nor is the Court persuaded by CBS's argument that these elements, taken together and in combination, give rise to a finding of "substantial similarity." CBS contends that Glass House's

---

[5] At hearing, CBS emphasized that these structural features are already giving rise to substantive similarities between the two shows. For instance, CBS's counsel remarked that "[the Glass House contestants] are already bowling in the kitchen, and they haven't even gotten to the first episode." That various "real" people find kitchen bowling to be a worthwhile way to spend their time on reality television, however, does not make the two works "substantially similar."

LINK: 41

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

wholesale borrowing of Big Brother's constituent features "emulates the key expressive features of Big Brother – namely, an unscripted house reality competition show whose voyeuristic feel depends on minimal interaction between cast and production, and viewer and production." (Reply at 7.) That characterization, however, still fails to identify the sort of concrete discernible and protectable "plot," "themes," or "dialogue" that might give rise to a finding of similarity. Although the Ninth Circuit's decision in Metcalf recognized the possibility of a "selection and arrangement" claim, a close reading of that case dispels any notion that CBS can make out such a claim on these facts. 294 F.3d at 1074. In Metcalf, the Court of Appeals addressed two works with extensive and concrete similarities with respect to their plot structure, themes, and character traits. Id.[6] Nothing in Metcalf furthers CBS's position.

Instead, Metcalf reaffirmed the basic contours of this Circuit's extrinsic test, noting that "[g]eneral plot ideas are not protected by copyright law" and "remain forever the common property of artistic mankind", and that "protectable expression includes the specific details of an author's rendering of ideas, or the actual concrete elements that make up the total sequence of events and the relationships between the major characters." Id. (quoting Berkic, 761 F.2d at 1293 (9th Cir. 1985)) (internal quotation marks omitted) (emphasis added). CBS cannot merely cobble together a series of structural and conceptual reality television "elements" having little, if anything to do with "specific details" or "concrete elements" of the artwork, and then point to Metcalf. See, e.g., Bethea, 2005 WL 1720631, at *11 ("Plaintiffs' alleged similarity is nothing more than a string of generic 'ideas' which is not protected by copyright law."); CBS Broadcasting, 2003 U.S. Dist. LEXIS 20258, at *22—23 (finding "elements defining a [reality television] genre . . . too abstract to be protected.") That case does not, as CBS appears to urge, protect any combination of unprotectable elements, irrespective of their bearing on this Circuit's

---

[6] Indeed, the Ninth Circuit noted that "[t]he similarities between the relevant works [was] striking":

> Both the Metcalf and Bochco works are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs. Both deal with issues of poverty, race relations and urban blight. The works' main characters are both young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located. Both surgeons struggle to choose between the financial benefits of private practice and the emotional rewards of working in the inner city. Both are romantically involved with young professional women when they arrive at the hospital, but develop strong attractions to hospital administrators. Both new relationships flourish and culminate in a kiss, but are later strained when the administrator observes a display of physical intimacy between the main character and his original love interest. Both administrators are in their thirties, were once married but are now single, without children and devoted to their careers and to the hospital. In both works, the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician.

Metcalf, 294 F.3d at 1074.

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

extrinsic test. See Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003) ("[I]t is not true that any combination of unprotectable elements automatically qualifies for copyright protection."); Zella, 529 F.Supp.2d at 1138 ("Many courts have been reluctant to expand this [selection and arrangement] concept beyond the clear-cut case presented in Metcalf.")[7]

   It is, therefore, this very aspiration towards the "real" which has plagued other attempts to protect reality television concepts from infringement, and which dooms CBS's attempt to enforce copyright interests in Big Brother. Although the parties speak of the shows as highly contrived in everything from the selection of contestants to the manner in which characters are forced to sleep, the fundamental premise is to let "reality" play its course. As this Court has previously noted, reality television programs do not, as a general matter, entail a "plot as that term is normally used" in the context of copyright law. Milano, 584 F.Supp.2d at 1296. Rather, these programs contain a "contest structure," from which "a 'plot' emerges as the participants, through the dynamic of the [show], reveal their character and begin to assume specific roles." Id. For purposes of copyright, then – for purposes of the "expression" to which these programs give rise, and on which basis they are compared in assessing legal "similarity" – the network's advertising is more instructive than its legal argument. "Reality," it turns out, is hard to copy.

**C. MISAPPROPRIATION OF TRADE SECRETS**

   In an appendix attached to its memorandum, CBS lists fourteen (14) purported trade secrets allegedly misappropriated by Defendants, ranging from the "Big Brother manuals," which provide instructions to show contestants, to various filming, editing and production techniques that CBS contends are unique to Big Brother, and which enable its singular feel and success. (App., Appendix A [CBS's Trade Secrets].)

   To establish a prima facie claim for trade secret misappropriation under California's Uniform Trade Secret Act ("CUTSA"), a plaintiff must demonstrate [1] ownership of a trade secret; [2] that the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means; and [3] that the defendant's actions damaged the plaintiff. Sargent Fletcher, Inc. v. Able Corp., 3 Cal.Rptr.3d 279, 283 (Ct. App. 2003). Under California Civil Code section 3426.1(d), "trade secret" is defined as any "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent

---

   [7] The cases relied upon by CBS do not call that conclusion into question. CBS repeatedly seeks to extract from the case law and superimpose onto the present facts standard recitations concerning "similarity." But the gloss given to those words by the numerous courts that have interpreted them do not lend support to their basic argument. No court has upheld a copyright claim seeking to protect the skeletal features of a "reality television" show, and the Court finds nothing in the current record that would justify breaking new ground in that regard.

LINK: 41

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

On the basis of the record currently before it, the Court entertains serious doubts as to CBS's ability to demonstrate either [1] that the purported trade secrets listed qualify for protection; or [2] that Defendants are actively misappropriating any such trade secrets. As an initial matter, the only evidence of even <u>potential</u> misappropriation offered by CBS is Rosen's admission that he consulted one of Big Brother's "Master Control Room" schedules in determining how many "story producers" to hire, and that he had an assistant type up portions of a Big Brother "House Guest" manual, which provides contestants with rather generic instructions concerning how to conduct themselves in relation to their appearance on television. As described by CBS, however, neither of these documents appears to contain the sort of "formulas," "methods" or "processes" that can be said to "derive independent economic value . . . from not being generally known to the public . . . ." Cal. Civ. Code § 3426.1(d)(1). <u>See, e.g.</u>, <u>Agency Solutions.Com, LLC v. TriZetto Group, Inc.</u>, 819 F.Supp.2d 1001, 1018—1019 (E.D. Cal. 2011) (finding that purported trade secret in "process flows" and "interfaces" did not "come close to providing a basis for understanding the boundaries or nature of the alleged trade secret, nor . . . provide any basis for a determination that the alleged secret is not a matter of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade.") (internal quotation marks omitted).[8]  At least at this stage of the litigation, CBS has not offered anything resembling an adequate explanation as to how the material contained in either of these documents constitute trade secrets.

Moreover, as Defendants note, even if such generic material could constitute trade secrets, various portions of similar versions of the House Guest manual are available on the Internet, revealing much of the same safety and logistical instructions given to contestants in other "Big Brother" competitions. (Declaration of Carolyn H. Luedtke ("Luedtke Decl."), Ex. B [Big Brother Rules].)  Further, in his deposition testimony, Rosen clarifies that he ultimately did not make use of the Master Control Room schedule, at least in the sense relevant to that

---

[8] The Court finds CBS's reliance on such cases as <u>Vermont Microsystems, Inc. v. Autodesk, Inc.</u> and <u>O2 Micro Intern. Ltd. v. Monolithic Power Systems, Inc.</u> unavailing.  88 F.3d 142 (2d. Cir. 1996); 420 F.Supp.2d 1070 (N.D. Cal. 2006).  Although these authorities recognize that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage", <u>Vermont Microsystems</u>, 88 F.3d at 147, each relied upon extensive descriptions specifying the precise nature of the trade secret at issue and the unique economic value derived from it.

LINK: 41

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

document's unique economic value, as his hiring practices revolved almost exclusively around budgetary considerations.  (Rosen Deposition at 90–93.)  Absent a stronger showing as to either element of a misappropriation claim, the Court will not enjoin the production and broadcast of ABC's show based solely on the haphazard use of two generic documents.

As to the remaining filming, editing and production techniques which CBS claims as trade secrets, the Court has no basis on which to find either ownership or misappropriation.  As Defendants point out, similar techniques are commonplace in the production of reality television programming, and CBS bears the burden of delineating precisely what makes these particular techniques unique and valuable.  (Declaration of Corie Henson ("Henson Decl.") ¶ 8.)  Further, CBS provides no evidence that Defendants actually used these procedures, citing only a "wealth of indirect evidence" of misappropriation, namely "the numerous media accounts describing Glass House as a knockoff of Big Brother" and "the hiring of 30 strategically selected Big Brother staffers," which it claims "raise an inference of improper use."  (App. at 22.)  Such circumstantial evidence, without more, is plainly insufficient to support the issuance of an injunction, particularly in the face of California public policy favoring the mobility of employees and the experience they have gained in prior employment.  See, e.g., Whyte v. Schlage Lock, Co., 125 Cal.Rptr.2d 277, 294 (Ct. App. 2002) ("[T]he inevitable disclosure doctrine cannot be used as a substitute for proving actual or threatened misappropriation of trade secrets."); FLIR Systems, Inc. v. Parrish, 95 Cal.Rptr.3d 307, 316 (Ct. App. 2009) ("Mere possession of trade secrets by a departing employee is not enough for an injunction.")

## D. OTHER PRELIMINARY RELIEF FACTORS

Even if the Court were persuaded that CBS had some likelihood of success on the merits, it finds that CBS has failed to establish the remaining factors for preliminary relief.

### 1. IRREPARABLE HARM

First, CBS has failed to demonstrate that it would be irreparably harmed by denial of the application.  As the Ninth Circuit has recently made clear, irreparable harm is no longer presumed in a copyright infringement case.  See Flexible Lifeline Systems, Inc. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011) ("We conclude that presuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by the Supreme Court's [recent] opinions . . . . [E]ven in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent.")

LINK: **41**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

As the Court noted at the hearing, there is no indication that the broadcast of Glass House would in any way dull viewers' appetites for Big Brother or similar reality television programs. Moreover, even if the broadcast of Glass House did result in a loss of viewership for Big Brother, there is no indication that this harm would be "irreparable"; CBS has not demonstrated that any potential loss in viewership could not later be compensated through money damages. See, e.g., Metromedia Broadcasting Corp. v. MGM/UA Entertainment Co., Inc., 611 F.Supp. 415, 426–427 (C.D. Cal. 1985) (finding potential loss of viewers and advertising revenue insufficient to establish likelihood of irreparable harm, and compensable by money damages). In the absence of any evidence that the broadcast of Glass House will cause it to suffer any harm that cannot be compensated by money damages, the Court concludes that the failure to make such a showing is an independent ground for denying the requested restraining order.

### 2. BALANCE OF HARDSHIPS

Moreover, the Court finds that, at least on the basis of the current record, the balance of hardships tips sharply in favor of Defendants. That inquiry requires the Court to "consider the harm that the nonmoving party will suffer if the injunction is granted, balancing it against the irreparable harm to the moving party from the denial of relief." Reid L. v. Ill. State Bd. of Educ., 289 F.3d 1009, 1021 (7th Cir. 2002) (emphasis added).

The issuance of an injunction will disrupt, if not terminate the employment of the more than one hundred employees working on Glass House, as well as the Glass House contestants, who gave up their own employment opportunities to take part in the show. (Bock Decl. ¶ 5; Declaration of Deborah Anderson ¶¶ 3–4.) Defendants' investment in Glass House, including the show's development and promotion, estimated to be above $20 million, will be rendered almost worthless. (Declaration of Jill Gershman ¶¶ 3–4.) By contrast, and as explained above, CBS has not shown that the potential harm to Big Brother would be irreparable. Even if the broadcast of Glass House in some way diverted viewers from Big Brother to Glass House, that reduction in viewership would be compensable through an award of money damages. Measured against the immediate and substantial harm that Defendants would suffer due to an injunction, the Court finds that the balance of hardships tips sharply in favor of Defendants.

### E. SPOLIATION OF EVIDENCE

Finally, CBS contends that Rosen has admitted to destroying potentially relevant e-mails, and asks the Court to enjoin any such further spoliation.

LINK: 41

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-04073 GAF (JEMx) | Date | June 21, 2012 |
|---|---|---|---|
| Title | CBS Broadcasting, Inc. v. American Broadcasting Companies, Inc. et al. | | |

In his deposition, Rosen states that his general practice is not to maintain copies of all e-mails he sends and receives, but rather to "keep e-mails that [he] think[s] [he] may need to reference in the future, and . . . delete e-mails that [he] [does not] think [he will] need to reference in the future." (Rosen Deposition at 33–34.) Although he admits that in so doing, he "delete[d] e-mails relating to Glass House after this lawsuit was filed", Rosen's counsel states that all e-mails were preserved, and that his e-mail accounts have since been forensically imaged. (Id. at 48–49.)

In light of any continuing uncertainty as to the preservation of evidence relating to this action, the Court orders as follows:

All parties to this action shall preserve all relevant documents, as defined under the Federal Rules of Civil Procedure, including but not limited to all electronic evidence or evidence stored on computers regardless of the medium on which it is stored. "Relevant documents" includes all documents that contain any information regarding the creation, development and production of Glass House.

For purposes of this Order, "preserve" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things including all documents as defined above and those that are reasonably anticipated to be subject to discovery under Federal Rules of Civil Procedure 26 or 34 in this action. To preserve includes taking steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, erasing, wiping, relocation, migration, theft or mutation of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible.

### IV.  CONCLUSION

For the foregoing reasons, the Court finds that CBS has failed to demonstrate an entitlement to the preliminary relief sought. The application is **DENIED**, except with respect to the preservation order discussed above. The request for an order to show cause re: preliminary injunction is also **DENIED**.

**IT IS SO ORDERED.**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

### CV12- 9751 GW (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

MUNGER, TOLLES & OLSON LLP
355 South Grand Ave., 35th Fl., Los Angeles, CA 90071-1560
(213) 683-9100
EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP
6420 Wilshire Blvd., 17th Fl., Los Angeles, CA 90048
(323) 301-4660
Plaintifffs K.Rosen, C.Henson, and M.O'Sullivan

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kenny Rosen, Corie Henson, and Michael O'Sullivan,<br><br>PLAINTIFF(S)<br><br>v.<br><br>CBS Broadcasting Inc.,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV12·9751 GN (JCx)<br><br><br>SUMMONS |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Glenn D. Pomerantz _____, whose address is Munger Tolles & Olson - 355 South Grand Ave., 35th Fl., Los Angeles, CA 90071-1560 _____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __11-14-12__

By: __SHEA BOURGEOIS__
Deputy Clerk

(Seal of the Court)

1184

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Kenny Rosen, Corie Henson, and Michael O'Sullivan, | CBS Broadcasting Inc. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| MUNGER, TOLLES & OLSON LLP - 355 S. Grand Ave., 35th Fl., Los Angeles, CA 90071-1560; (213) 683-9100 | Gibson Dunn 333 South Grand Avenue Los Angeles, CA 90071-3197 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business in Another State | ☑ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☑ MONEY DEMANDED IN COMPLAINT: $ 500,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332; 28 U.S.C. Sections 2201, 2202; for declaratory judgment that arbitration has been waived and contract not breached.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act | |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent | |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | SOCIAL SECURITY | |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) | |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:    Case Number: **CV12·9751**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a).  **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No  ☐ Yes

If yes, list case number(s):

VIII(b).  **RELATED CASES:**  Have any cases been previously filed in this court that are related to the present case? ☐No  ☑Yes

If yes, list case number(s): CV 12-04073 GAF (JEMx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):                              Date November 14, 2012

Jonathan E. Altman

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com